The first case is Olson v. Major League Baseball and I believe we're ready to begin. We are, Your Honor. Good morning. I'm David Golub and I represent the plaintiffs in this action. District Court's decisions dismissing... Before you begin, Mr. Golub, did you want to reserve some rebuttal time? I did reserve three minutes, if Your Honor, please. Three minutes. Thank you. Thank you. The District Court's decisions below in dismissing the case fundamentally misunderstand the protections that are afforded by the Consumer Protection Acts in plaintiff's home states. Those acts, like Consumer Protection Statutes across the country, are modeled on the Federal Trade Commission Act. They're intended, like the Federal Trade Commission Act, to provide protections against unfair and deceptive practices in the sale and marketing of goods and services, and they are intended to reach not only direct sellers, but third parties that engage in marketing activities, either for or with direct sellers. And the acts provide this broad relief, and that's what this relief is called. It's broad relief changing the traditional common law restrictions on how consumer protection liability could be applied. They create new statutory rights. These rights eliminate traditional elements of common law causes and replace them with broad remedial protections. Statutes eliminate privity as a requirement for triggering liability under the act. Do you mind identifying the unfair or deceptive practice? I mean, that's a common practice. Can you articulate precisely what it is? Sure. And the statutes differentiate between unfairness and deception. The unfair practice in this case is marketing a product with statistical data that provides a key component of the product that is corrupted and unreliable and prevents the exercise of skill by contestants in the fantasy baseball games. Mr. Golub, I don't understand that at all. The statistics that are used by DraftKings are the statistics that are the official statistics of Major League Baseball, and that's what they're represented to be. So what is the problem? The problem, if Your Honor please, is that the contestants in these games are told that this is a game of skill that is based upon their ability to use knowledge and judgment based upon the statistical performance of players, and you cannot use... But baseball has all sorts of cheating and always has. Anyone who thinks they have skill in understanding baseball statistics know that there have been players who use cork bats. There are pitchers who mark up the ball or use pitfalls. There are players who use steroids or other performance-enhancing drugs. The sport has various ways of trying to police these things. But first of all, if they don't catch the perpetrators, then those different forms of cheating, if you will, affect the statistics. And if they do catch them, so much for your skills. If you have predicted that a player based on test performance is going to perform above his historical value in the coming year, and that player then tests positive for steroids and is banned, you lose in the competition. If that player gets into a feud with his manager and gets benched, that's luck as far as you are concerned as a predictor. And that's all baked into the sport, and anyone ought to know that. So why is this particular form of cheating somehow different? Judge, everything that you have just For those of us who have lived with baseball, of course that is an issue. But there's a difference here in this case. Everything you've described is a player cheating and either being caught or not being caught. Or even in some cases, a team cheating and being caught or not being caught. That's not what we have in this case. We have in this case a league that is alleged to have known about the cheating, alleged to have let it continue secretly, knowing... So what? That's what happened with the steroid epidemic as well. That for years, everyone in the world knew that some players were cheating. And baseball liked it because there were lots of home runs and no effort was really made for quite a long time to crack down. Again, you're talking not about naive people. Your whole argument is that the players are relying on their so-called skills to win what is, like poker or various other games, partly skills and partly the luck of what happens in the world. Judge, I think that the players had no knowledge that Major League Baseball was systematically allowing electronic sign-stealing, knowing it was going on, knowing it corrupted the statistics and selling or participating in... Mr. Gall, what would be the difference if they knew there was sign-stealing even without electronics? Everybody knows that there are ways to steal signs. Teams can steal signs from the third base coach. Runners on second can steal signs from the catcher. As Judge Lynch pointed out, everybody knows that. So what's... Anyone who's playing fantasy baseball would understand that there's all kinds of rule violations that occur with the league's knowledge, with the league's knowledge, with everybody's knowledge. That's not a violation to steal signs from second base and it's not done... Your theory affects statistics. It all could affect statistics. It could all affect a player's performance. There's no difference from that. I'm sorry. The difference... thematic electronic sign-stealing dramatically changes the fairness of the game. Yes, there are individual instances of stealing a sign from second base or a third base coach stealing a sign, but what the allegations in this case are, and the allegations are supported by public admissions, that the Astros, for example, electronic sign-stealing, which was done systematically, was reported to Major League Baseball and Major League Baseball, initially, when it was reported by the Oakland Athletics, did nothing. When the report became... On your theory, Mr. Galb, every ticket holder would have the same causes of action under the state laws, right? Ticket holders, Your Honor, are in a different status. The case law is very clear. They're more direct than your client. I'm sorry, Judge. They would be more direct consumers, right, than your client. Yes, but the ticket holder cases hold that the ticket holders have nothing other than a license to attend a game. What we're dealing with is a product that Major League Baseball is helping to market for millions and millions of dollars of revenue and millions and millions of dollars of equity increase in their interest in draftkings, and selling that, knowing that people cannot use skill because the statistics are being regulated by... I don't know what you mean by they cannot use skill. They're using their skills in precisely the same way, whether this cheating goes on or not. They're attempting to estimate how well particular players are going to do next year, something that is affected by many kinds of luck, not just skill. Let me just respond to that directly. First of all, that is not the rationale for the dismissal below. That is a fact issue that the defendants can argue if they want to argue that the decisions were fair, but here's why it's not true. It's not true because if I'm a pitcher and I'm pitching against the Astros on day one, my statistics are going to be negatively impacted. Yes, and if suddenly there's a downpour that day and the game is allowed to continue in the rain, the pitcher is perhaps going to perform differently than he would have if the sun had shone. And that all goes into what the annual or weekly or whatever statistics are, and your wins not based on his cleverness in estimating the skill of the performer, but in the luck of the draw. Isn't this whole issue of game of skill simply a legal fiction? The marketing of this as a game of skill is really a way of saying it's not gambling for legal purposes, and that either makes sense or it doesn't. It's either the law or it's not, but it really has nothing to do with what makes the game fun. What makes the game fun is in part like any other game that you can't predict the outcome going into it. Judge, I don't think you can call it a legal fiction because first of all, in order to be lawful, it has to be based on skill. Yes, exactly, exactly. Game of, excuse me, game of skill is not something that says, guess what, if you're the smartest baseball guy in the world, you will win. And if you're not, you will lose. Game of skill is a term of art under the law, and it either qualifies or it doesn't. And that's a different story altogether than what you're claiming. You're claiming that this is a game that if Theo Epstein were allowed to play, he would win every year because he's the smart, or Billy Dean or one of these guys would win all the time because they're the smartest baseball guys, and they don't win every year on the field. And the equivalent out in the world doesn't win every year in his refusery league. That is exactly, by the way, what Major League Baseball argued to the New York General Assembly and to other General Assemblies. They presented peer-reviewed studies showing that players win by skill, not by random chance, that the data shows that the more experienced and skillful players are the ones who overwhelmingly win. And that is why people compete. This is not... This is not... Would the same result obtained under the consumer protection laws if the Major League Baseball had concealed information about a player's health condition? Well, the difference judges the systematic nature of this and how this affects completely not just the Astros player as a team performance, but the opposing player's team performance. And when players pick their fantasy teams, they're unable to make knowing decisions because it's not just one injured player. It is a raft of teams. It's all teams, and it's who's playing whom. How do you use skill if you have no... If you don't know which games are being... Which games this is happening in, which at-bats it's happening in? Is it home games? Is it away games? It's not simply... You're saying there's more... It's more systematic electronic science dealing than it is to conceal injuries of players by teams? Absolutely. Absolutely, Judge, because this is every hitter on the team at home being given the pitch. Look at the outrage among Major League players. Curt Chilling said, this is rigging the game. How is this case any different from the Mayer v. Belichick Third Circuit case? I know that was a ticket holder case, but the reason in that case, and there was a fraud claim in that case as well, was similar as Judge Lynch pointed out, that there are all types of violations of the rules. It's understood by everybody. So how is this case different from that one? It said we shouldn't second-guess a league's enforcement of its own rules as courts. The whole thing in that case turns on the fact that when you buy a ticket, all you have is a right to a license. It's a license to sit at a game. It's not a separate product that you're paying money to compete in where one of the key components of the product is not fairly constituted. Yes, obviously, this involves baseball, but the product here is a separate product, fantasy baseball, that Major League Baseball markets and sells, markets and helps DraftKings sell for enormous revenues. It is, I think, a factual issue whether people would think these statistics are fair. It's a factual issue whether people would participate in fantasy baseball contests if they knew about the electronic sign stealing, if they knew that Major League Baseball was concealing electronic sign stealing. That's what the complaint alleges. The complaint alleges we would not participate if we knew about the electronic sign stealing. We would not participate if we knew that this was being concealed. That wasn't the rationale that the district court relied upon in dismissing this case. That's their defense. That's a factual defense. Let a jury decide whether that factual defense is accurate or not. I don't think on a motion to dismiss, well, the district court didn't and I don't think this court on a motion to dismiss can resolve the disputed factual issues. Baseball players would believe it's a fair, would reasonably believe it's a fair contest, and it's an objective, it's an objective standard for, it's an objective standard, and the concealment is also something that we have a right to have a jury decide. Thank you, Mr. Golub. We'll hear from Mr. Hardiman. Thank you, your honors. The way we've divided things up here is we're going to divide 12 minutes to the appeal in chief and the last four minutes to the cross appeal. Mr. Levine is going to handle all of the cross appeal. I'm going to take the first 10 minutes or so, and then Ms. Preston of the Astros is taking two minutes, unless the panel has a specific question of the Red Sox, in which case I'd relinquish some of my time for the Red Sox. The panel is really already focused on what were the two main points of my presentation. One is that the appellants are packing an awful lot into the words contest of skill. I mean, this case has taken a long journey through a lot of legal theories, and now that's what it's down to, and plaintiffs are essentially arguing that that term, which is a term of use that DraftKings gives to its participants, that because baseball has a licensing agreement with DraftKings, which requires that its sponsored games be operated under the terms of use, that that's tantamount to a representation by baseball that there will be no rule breaking, or at least will be immediately disclosed. And I guess also a representation that there will be rules about this sort of thing. I mean, with respect to Mr. Golub's argument that the difference here is it's a league, I guess, condoning things. Don't forget the fact these are rules of baseball. Baseball put them in. The baseball constitution says the commissioner will decide how these rules will be enforced. I mean, baseball may decide tomorrow that electronic science is no worse than regular science, and which is what happens to the theory then. There simply is no reasonable reading of what's in their terms of use to impose some obligations on baseball with respect to its business. And of course, the other implausible aspect of the argument by the appellants, which Judge Lynch focused on, is there are so many things that can affect the ability of a fantasy player to predict the performance. And appellants seem to acknowledge that. Their argument seems to be that all those other things do not change what is a contest of skill to a contest of chance. But there's something special about electronic science, especially from all other even illegal things that we know can go on. And without those two premises, all of their claims go. There is no fraud because there is no misrepresentation. There is no negligent misrepresentation because there is no misrepresentation. Mr. Hardiman, one of their other theory, you're right, that that is the primary focus, but they do focus on statements by the commissioner about ensuring the integrity of the game. I think that's a separate sort of predicate, I guess, for their claims. Do you want to address that? Right. Sure. I mean, they speak about those statements as if they were general statements, but they're actually not. They're quite specific. And there were statements relating to protecting baseball from the impact of gambling on baseball. They say nothing about protecting drafting participants from rule breaking in baseball. And the comments, as Judge Rakoff pointed out, are quite clearly about baseball. They're not about drafting at baseball. I'd also point out that the comments, the specific statements, one statement they focus on by Commissioner Manford was actually in 2015, so before all the conduct in this complaint, that this complaint complains about, even occurred. With respect to the consumer protection statutes, and of course, the appellants focus on that because they probably have the most judge Livingston pointed out, there is commonality. And the commonality is there has to be some deceptive or unfair practice, which causes injury. And again, this case goes, because there is no deceptive or unfair practice. And while I know point is right, right, and understanding that if we agreed with you on that point, we would not, we wouldn't even have to reach the neck, the interpretation of nexus. Exactly. Exactly. And just the point, I know that appellants spend a fair amount of time in their papers trying to differentiate unfairness from deception. But if you read it carefully, what they're saying is the unfairness is that they didn't know about the deception. And I'll quote you their own complaint, which says on paragraph four, defendants concealment of the misconduct in marketing of the contest of games of skill was unfair and deceptive. It's exactly the same thing. You know, I, our second point here, which is the only one other one I really wanted to hit on during the argument is the contest of skill statement, even if you thought it doesn't, it can somehow be interpreted as the appellant's argument. Baseball didn't say as I pointed out before, it's in the draft king's term of lease. Baseball has a licensing agreement with draft kings. There is a provision that says that their games will be operated pursuant to terms of use. It doesn't say, you know, as contest of skills, it's pursuant to the terms of use. And that's it. The plaintiffs, the appellants seem to claim that they would be misled by that, by the fact that by putting that term in their licensing agreement, baseball was somehow committing again to contact against rule breaking. I think that's a pretty long rope between the alleged statement and any sort of injury. The commissioner did say it back in October of 2015. I know there's an issue of reliance on that, but it was a separate statement by the commissioner, right? The separate statement by the commissioner is a statement in which he says that he was convinced that fantasy sports were a contest of skill under the federal statute. And Judge Rakoff quite correctly said that is an unacceptable statement of opinion. And the only response appellants have to that is to cite some cases where cases were a lot different, but they court said that was a statement of fact. So that's the only other statement they point to other than the terms of use. And by the way, I don't know if we have this in a brief, but it occurred to me, what they're relying on is not what's in terms of use, but the fact that Major League Baseball, what it has in the license agreement, the plaintiffs wouldn't even have known about that. That was a private contract. So to allege that they somehow thought baseball was making some representation here, it's based on a document they didn't even say. I mean, if you look at the cases that they cite to support all of their claims, they're so much more remote, pardon me, so much more direct in terms of the involvement between the defendant and the plaintiff than you have here. Cases were direct misrepresentations were made. The lead click case where the defendant was creating fake news sites and actually writing the fake news. It's not even close. You know, at the end of the day here, your honors, this is really very similar to Meyer v. Belichick case, who's, even though they scoffed at this point in our brief, the plaintiffs are asking baseball to regulate itself. They're trying to intrude on the regulation of the game by baseball. I mean, when should these things be disclosed? By the way, when somebody makes an allegation, when they're confirmed, when they're punished, those are the sort of things that the Third Circuit said in Meyer v. Belichick said courts shouldn't get into. And they certainly shouldn't get into it just because there's an undisclosed rule violation because, as Justice Bianco said, everybody knows about that. I know you say they raised this for the first time on appeal, but it is in their proposed amended complaint about recommendations of fantasy lineups. They argue that that's a more direct involvement by your clients. And what's your response to that? Again, to extend the contest of skill comment to somehow put some obligation that baseball on its TV network shouldn't have anybody talk about what people always talk about in TV shows, who's doing well, what should you do, who should be playing. That's a separate thing than saying anything about how fantasy baseball is conducted. Also, that allegation is clearly subject to 9b. And the reason we raised that is because they never raised it. It's a fraud allegation below and under 9b. I mean, that allegation really isn't even close. They don't say who said what when they said what was misleading. It is a it is a completely conclusory allegation. One thing I'd like to just say for a minute before I get off, we all have our pet points in cases. So I just want to say this one. One thing that plaintiffs surely have to show is loss. The only allegation of loss they've made, and we've raised this everywhere we've argued this, is that they would not have paid the fees to play in the fantasy contest had they known about the science. What they've never alleged is whether or not they actually won the games. Did they win the contest? Did they make money in them? And I would submit they would pay the fees if they had known they were going to make money. And that would seem to be a critical allegation that they have never made. With that, unless there's further questions, I'll relinquish the rest of my time to Ms. Preston. Thank you. Thank you, Your Honors. Just a few quick points. With respect to the game of skill that has become the focus on appeal and even during this argument, the agreement that is the tie for the game of skill representation is an agreement only between MLB and MLBAM and DraftKings. Neither the Red Sox nor the Astros are a party to that agreement. Back to the consumer fraud claims that Mr. Golub has focused on, there's only one Texas DTPA consumer fraud claim that is made against the Astros. The type of product here involved, daily fantasy sports, is specifically not protected as an esteemed and intangible under the Texas DTPA. And their consumer fraud claim fails against the Astros for that additional reason. With those two additional points, unless the panel has any questions, I will. Thank you. Mr. McGee? Before I start, Your Honors, I can just tell you, Columbia alumni, Lou Gehrig is looking down and he's very happy that I have you guys as a bench today. My name is Randy Levine. I'm counsel to the Yankees and may it please the court, thank you for listening to me today. This case stems from Judge Rakoff's decision to dismiss the plaintiff's case for failure to stay in action. And his holding was very clear, as you've talked about this morning. Fantasy baseball is not real Major League Baseball. The two are different. The Yankees weren't even a party to this case, not a party to this case. How do we get involved in it? What happened is there was a confidential investigation run by the commissioner in a different matter entirely, known as the Apple Watch case years before this. Mr. Levine, excuse me. I mean, this happens all the time, of course, in litigation, that people who are not parties to the litigation become witnesses or provide documents, required to provide documents, and or somebody else has a document that implicates them or affects them in some way that becomes part of the case. And that undermines that person's privacy. They may be very unhappy that they're involved in the case where they didn't do anything wrong or aren't sued or anything of the sort. So why does that fact matter that they're dragged into this, the Yankees dragged into this against their will? It matters a lot, as I will describe, Judge Blanks. It matters because, A, the information was sent over and was under a case. B, it was sent over because everybody recognized it was part of a confidential investigation where baseball polices itself. But Mr. Levine, suppose Judge Rakoff had reached a different conclusion and said, oh my God, if this is something that baseball covered up, then the plaintiffs have a case and they should be allowed to go forward. The letter would become a focal point. If he did that, then none of the points you've made so far would matter, right? No, I disagree. I still think under that circumstance, we had very serious privacy rights that clearly needed and would be protected. So if there were a trial of a case in which this letter became a focal point, the courtroom would have to be sealed and no one would be able to, no one in the public would be able to know about a fact that was central to the case? No, what I'm saying, Your Honor, is that's a hypothetical that I think under those circumstances there would have to be a lot of stages discussed. Because in fact, this letter doesn't mean anything. Once the judge in this case felt that it was related to Major League Baseball, it became irrelevant. The case should have been over. The plaintiffs had this letter. They never even relied on it. During the time of this letter, they weren't even fantasy players. So what happened here? What happened, with all due respect, Your Honor, is it was a Hail Mary. They looked at it and they said, this is the New York Yankees. We'll release these papers. The New York Yankees get a lot of publicity. And guess what's going to happen? Maybe Judge Rayburn. You know, Mr. Levine, the reason why documents are classified as judicial documents is not about whether they're helpful to one side or the other or not in the litigation. It's not about whether the public would be interested in the Yankees or not. It's about assessing the performance of the judge. The judge performed a judicial act by saying this was irrelevant. And you're saying, and nevertheless, the public does not have a presumptive right. And you have two points. And I'm trying to distinguish the two. But as far as the point that there is not a presumption of judicial access, what you're saying is the public has no right to know whether Judge Rakoff was totally out for lunch in making the ruling that he made or not. Well, that's not what I'm saying. What I'm saying is Judge Rakoff made the ruling that this fantasy baseball is different than Major League Baseball. This letter has to do with in his decision. Why the letter came into play and your own decision, Your Honor, in the Newsday case sets out the test. What happened here is very, very simple. A Hail Mary attempt by plaintiffs who never had the letter, never used the letter, admitted they didn't rely on it, was used in a motion for reconsideration. But isn't Judge Lynch correct that that is maybe more accurately assessed in the strength of the presumption and not whether there is a presumption? I'm sorry, Your Honor, I could not hear the question. Well, isn't it easier to think about those considerations in deciding whether the strength of the presumption, as Judge Rakoff did, should be outweighed by other factors rather than figuring out whether there is a presumption at all? I mean, as my colleague said, he did look at the document. He had to decide if it was relevant or not. That was the error. So I would argue, first, it wasn't a judicial document because of what I said, but even under the tests to balance it, I think the equities are with us. Why? And how did he abuse his discretion and his balancing? Yeah, well, I think that it was wrong and it was a reversal of the letter, and I'll tell you why. Why? This is, as the court has said, baseball does confidential investigations. We, our employees, were told that the information would be confidential. Two, the decision of the commissioner, who you've recognized here, Your Honor, is responsible for making these decisions, was in a press release. He decided under the rules that's what the decision is. Even Judge Rakoff said the two are comparable. Judge Rakoff isn't the commissioner of baseball. He's the judge. His role ended when he made his ruling. This letter, okay, is got to be, there is serious privacy, all of our employees, serious privacy issues because of confidentiality. Mr. Levine, your point of memo. Can I add one other thing? Sure. If it was so important, Your Honors, so important, these confidential letters, and it didn't involve the Yankees. The main players here, the Red Sox, who had two confidential letters, and the Astros, who had one, they weren't released. Judge Rakoff didn't release that confidential information. But, Mr. Levine, just to go back to the point of my colleagues, even if it's a digital document, your fundamental point is under the second part of the test that Judge Rakoff's finding that the presumption was at its strongest was an abuse of discretion because he had already determined that it didn't matter what the Yankee letter said, that if it was not any statement by baseball, electronic sign sealing, he had already determined in his first opinion was irrelevant. So no matter what that letter said, no matter what any other statement by Major League Baseball about electronic sign sealing said, was going to be irrelevant from the start. That's really the fundamental argument. That's correct, and that's my principal argument, but just in case that wasn't convincing enough, it's still, if you got past there, you must weigh under the law in this circuit. I mean, it is a problem that baseball did refer to the internal investigation. I know you're saying your client didn't have control over this, but Major League Baseball is Major League Baseball. They referenced it in their press release. So to some extent, this wasn't some completely confidential investigation that they made no reference to. No, no, the decision was in one document, the press release. This was an interim part of the investigation. It was not the final decision. Therefore, there's no reason for it to even be out there, because all of our employees, everybody expected confidentiality. And what's going to happen here, Your Honor, under your, you say you can't misuse the litigation system. If you allow this to stand, you're going to have plaintiffs bringing frivolous actions to get discovery, to obtain confidential documents from parties who aren't even part of this litigation. That's not a proper result. Thank you, Mr. Levine. We'll hear rebuttal. Mr. Golub, I think you're still muted. I'm sorry. Here I am. I want to address Judge Bianco a question you asked, and then go back to my colloquy with Judge Lynch. You asked about the recommendations that were on the television network on a daily basis of expert selections. And that is a very good example of how deception and unfairness is part of this case. Major League Baseball, if you accept the allegations of the complaint, knew that the Astros were cheating, knew that the electronic sign stealing was going on, knew that players that were playing for the Astros would have inflated results, knew that players playing for other teams against the Astros would have worse results, and nonetheless made recommendations on a daily basis of other players that fantasy contestants should pick. How is that fair? How is that not deceptive? Mr. Golub, these are recommendations that are attributable to Major League Baseball? Yes, these are on MLB TV. They're MLB TV programs. They are required. by the marketing obligations that the MLB parties undertook pursuant to the marketing agreement. And they're on a daily basis with expert recommendations of players. But they're required. Major League Baseball tells the announcers whom to tout as a coming player or whatever, as someone who should be the bet on in drafting? It's a Major League Baseball production, if Your Honor, please. I'm not saying what the direct communication is. So then why doesn't the fellow who's standing there, or woman who's standing there making the recommendations, look at the statistics and say, my God, Houston players are having a great year. You should pick all these Houston guys. Aren't they looking at the same things, the same statistics that the players outside are? I think you're looking at it from the wrong perspective, Judge. I think the perspective... I'm sure I am. Tell me why. I'm going to tell you why. Before I say that, I'm going to try to tell you why. It's because, Judge, the issue here is Major League Baseball is controlling that program. Whether or not the announcer knows, Major League Baseball knows. Major League Baseball has received the complaints. Major League Baseball knows that the Astros are engaged in this. The Astros know they're engaged in that. And they're letting the announcers make those daily recommendations, which mislead fantasy baseball players. That is exactly... By the way, whether it's... I'm still trying to understand where the misleading takes place. If the purported expert on television says, pick Jose Altuve because he's having a great year. He is having a great year. He may be having a great year because somebody's telling him the signs. No, that's not what he says. He says, pick Tanaka tonight. Tanaka is facing the Astros. He'll do very well. Pick Tanaka as your player when Major League Baseball knows that any pitcher facing the Astros is going to be at home, is going to be subject to the trash can scheme, and is going to have his pitches known. It's not that they're saying pick the Astros because they're doing well. It's because they're saying, pick a player who's facing the Astros or pick a player, pick somebody other than the Astros whose performance statistics are going to be impacted. Major League Baseball profits from the fact that the fantasy baseball player picked Tanaka rather than Altuve? It profits from marketing this product. It profits because people watch those programs and go out and play DraftKings Fantasy Baseball. They can do it right from the MLB.com website to the entry forms. By the way, this is the marketing that is called for, this specific detailed marketing that Major League Baseball and its clubs are required to provide. Okay, I think I understand that point. Can I ask just one question about Mr. Levine's argument, please? Yes. Has anybody but you asked for access for this document to be released to the public? Well, the press has contacted, the press has... Has anyone intervened? Is there anyone who has made an application to the court to have this document publicly released other than you on behalf of your client? Let me, there's no other application, but I think the court should understand the actual sequence of events here. The sequence of events was, Judge Rakoff had a pre-motion conference, has a pre-motion conference requirement. We alerted Judge Rakoff that we would be filing a motion for reconsideration with a motion for leave and we had a conference. At the conference, it was discussed what was the new evidence or what evidence was the complaint, the new allegations being presented upon and I identified the marketing agreement, I identified the Yankee letter. This is an off-the-record conference. It was agreed that what we would do was Major League Baseball would submit directly to Judge Rakoff all of the documents that were marked confidential and that I would submit them in redacted form under oath. The Yankees, by the way, were not part of this conversation in their brief, misdescribes what really happened. And what happened at that conference was Judge Rakoff said, I want you to know, I don't believe in these confidentiality rules. I'm very likely to rule, I'm going to consider whether these documents should stay confidential. We'll decide that later on. Then we had another conference because there was a problem with actually the sealing of the Yankee letter that had to get worked out. We had another conference. The Yankees were present at that conference because Judge Rakoff invited them. The Yankees said it should stay confidential. Judge Rakoff said, we'll keep this letter confidential for now, but I want you to know- Let me explain. Are you saying that not even you have asked that this be unsealed, that this is entirely a sua sponte Judge Rakoff production? No, I'm not saying, what I'm saying is Judge Rakoff then inquired, Judge Rakoff then inquired after we ruled whether anybody thought the letter should be unsealed. And I said, yes, the plaintiffs think it's a public document. So what I'm trying to get at is, what is it, does any of this matter in assessing the balancing that took place? Is this any different than if the New York Times and the Boston Globe and hundreds of thousands of fantasy baseball players and Yankee fans and Yankee haters around the country had all come in and said, this is a document in which we have enormous interest. I take it that would matter in assessing, in balancing the confidentiality issues that Mr. Levine is concerned about against the public interest in seeing the document. If Judicial Watch said, we've had our eye on Rakoff for a long time, we want to see what he really is deciding here and whether it makes sense and came in and asked for, would any of that matter in the balancing? And if so, does it matter that that hasn't happened? Okay, I think the first test, the first issue is that he abuses discretion and the answer I think is no. I think the reason that people haven't come in based upon conversations, people have called me and asked, the press has called me, I've declined to comment about it. The press, if they hear from this court that they have a right to go seek it, the press will go seek it. The press is eager to seek it and the press is especially eager to seek it because the Yankees have chosen to make statements about the letter, which could be confusing to say the least. Yeah, sometimes parties shoot themselves in the feet when they're trying to seek things confidential. I understand that. So, I'm sorry, Judge Bianco. Yeah, with the Chief's permission, I just have one question. How could the strongest presumption of access apply to this document when Judge Rakoff had determined in his initial decision that the press release itself, any statement about electronic sign stealing by the commissioner, by baseball, was, as a matter of law, not actionable in this case? So, that letter could have said anything and it could not possibly affect his ruling. No, that's not true, if I may respectfully answer. First of all, we think that that was wrong but even assuming that's correct, Judge, the letter establishes other elements that are absolutely relevant. The letter establishes when electronic sign stealing first occurred. Major League Baseball disclosed it as of the Astros in 2017. The court can determine whether that letter, contrary to what the press release says, indicates that something happened in 2015 and that's a factual issue in the case. When did it start? The letter also establishes this was denied by Major League Baseball and it's actually denied by the Red Sox in their brief that Major League Baseball would ever conceal anything about electronic sign stealing. And the court can decide whether on the issue of Sienta, whether what Major League Baseball elected to do vis-a-vis the statement on one day, the press release issued the very next day, whether Major League Baseball was in fact concealing intentionally electronic sign stealing. Those have nothing to do with the reliance issue and those have nothing to do with Judge Rakoff's conclusion that statements about Major League Baseball were not relevant. All right. Thank you. Thank you. Thank you, Mr. Gallo. We'll take the matter under advisement. Thank you. Excellent job by all. Very, very helpful presentation. Thank you, Your Honors.